# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 3, 2003 Session
### Heard at Murfreesboro[1]

## STATE OF TENNESSEE v. DARYL KEITH HOLTON

**Direct Appeal from the Court of Criminal Appeals**
**Circuit Court for Bedford County**
**No. 14302      William Charles Lee, Judge**

---

**No. M2000-00766-SC-DDT-DD - Filed January 5, 2004**

---

The defendant, Daryl Keith Holton, was convicted of four counts of first degree premeditated murder. The jury imposed a sentence of death on each conviction, finding that the prosecution had proven beyond a reasonable doubt the existence of one or more aggravating circumstances[2] and that the aggravating circumstances so proven outweighed any and all mitigating circumstances beyond a reasonable doubt. The defendant appealed, challenging both his convictions and sentences. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the convictions and the sentences. The case was then docketed in this Court, briefs were filed, and after considering the briefs and the record, this Court entered an Order requesting that the parties address certain issues at oral argument, including the sufficiency of the convicting evidence, the constitutionality of the statutory insanity defense, the constitutionality of Tennessee's capital sentencing scheme in light of Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002), and the propriety of the death sentences in light of the mandatory review required by Tennessee Code Annotated section 39-13-206(c)(A)-(D) (1997). After carefully and fully considering the issues in light of the record and the relevant authority, we affirm the defendant's convictions and sentences.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgments of the Trial Court and Court of Criminal Appeals Affirmed**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., filed a concurring-dissenting opinion.

---

[1]This case was heard as part of the October 3, 2003, S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project in Murfreesboro, Rutherford County, Tennessee.

[2]As to three of the convictions, the jury relied upon both the age of the victim and the mass murder aggravating circumstances in imposing the death penalty. See Tenn. Code Ann. § 39-13-204 (i)(1) & (12) (1997). As to the fourth conviction, the jury based imposition of the death penalty solely upon the mass murder aggravating circumstance.

John E. Appman, Jamestown, Tennessee (at trial and on appeal); Donna Hargrove, A. Jackson Dearing, III, and Larry F. Wallace, Jr., Assistant Public Defenders, Fayetteville, Tennessee (at trial), for the appellant, Daryl Keith Holton.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; W. Michael McCown, District Attorney General; and Weakley E. Barnard, Robert G. Crigler, and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**
**A. Guilt Phase**

On November 30, 1997, the defendant, thirty-six-year-old Daryl Keith Holton, shot and killed his four children, four, six, ten, and twelve years old. The State charged the defendant with four counts of premeditated murder. The critical issue at trial was the defendant's mental state at the time of the killings.

The State's proof showed that the defendant and Crystal Holton, the mother of the victims, married in 1984 while the defendant was serving in the United States Army and stationed at Fort Jackson in South Carolina. Shortly after their marriage, the defendant was reassigned to a post in Germany where he administered a dental clinic. While the defendant was stationed in Germany, the couple had two sons: Stephen, born in 1985, and Brent, born in 1987. Mrs. Holton testified that the defendant "loved" his military career, but she characterized their marriage as "up and down."

After his tour of duty in Germany, the defendant was stationed at Fort Gordon in Georgia. While there, he volunteered for service in Saudi Arabia at the conclusion of the 1991 Gulf War. Mrs. Holton remained in the United States with Stephen and Brent, and on September 17, 1991, she gave birth to a third son, Eric, who was hearing-impaired. Shortly after Eric's birth, the federal government incorrectly routed the defendant's paychecks causing Mrs. Holton serious financial difficulties. Also during the fall of 1991 Mrs. Holton left her children home alone overnight while she went to a country music bar and dance hall. The police were called after one of the children arrived at a neighbor's house looking for his mother. When Mrs. Holton returned home the next morning, the police declined to bring criminal charges, and representatives of the Georgia Department of Children's Services allowed Mrs. Holton to retain custody of the children.

After learning of these events, the defendant secured an emergency leave of absence and returned to the United States for several days. During this time, the defendant moved his family from Georgia to his father's home in Shelbyville, Tennessee. However, after the defendant returned to Saudi Arabia, Mrs. Holton left Shelbyville to visit a cousin in Indiana and thereafter moved to South Carolina, leaving the children in the custody of the defendant's father. The defendant obtained a hardship discharge and returned to Shelbyville so that he could care for his children. In June of 1992, he returned to Georgia and obtained a divorce and custody of the three boys. He and the

-2-

children returned to Shelbyville; however, Mrs. Holton testified that the defendant brought the children to visit her in South Carolina two or three times each month.

After Mrs. Holton became pregnant in late 1992 as a result of a "one night stand," she and the defendant reconciled and lived together in Shelbyville. On June 22, 1993, Mrs. Holton gave birth to her daughter, Kayla Marie. According to Mrs. Holton, the defendant accepted Kayla "rather well" and gave her his last name. Although the couple did not remarry, they lived together with the four children for approximately two years. During this time, Mrs. Holton drank heavily, and the defendant struck her on several occasions, blaming his violence on her drinking.

Eventually Mrs. Holton and the children left the defendant and moved into public housing in Murfreesboro, Tennessee. The defendant visited the children on a daily basis while they lived in Murfreesboro and was at some point awarded weekend visitation rights. Mrs. Holton testified that the defendant would pick up the children on Friday and return them on Sunday. Mrs. Holton related that the defendant expressed concern about the crime rate in the neighborhood where she and the children lived and frequently complained about the condition of her apartment. Mrs. Holton admitted that she was a mediocre housekeeper, that she regularly accepted money from the defendant for the purchase of alcohol, and that she purchased several pint-sized bottles of liquor each week. However, Mrs. Holton said she had not demanded money or liquor as a condition of the defendant's visitation with the children.

Mrs. Holton testified that the visitation happened without incident until one Sunday night in 1995 when the defendant refused to let the children get out of his car and ordered Mrs. Holton to get into the car if she ever wanted to see the children again. When Mrs. Holton refused, the defendant said, "Fine. You are going to regret it," and drove away. Mrs. Holton, who had the impression that the defendant was armed,[3] immediately called the police. Learning of his former wife's call from a police "scanner" in his car, the defendant surrendered the children to the police unharmed. Mrs. Holton recalled that after this incident the defendant continued to threaten that she would "regret it" if she ever took his children away from him. Mrs. Holton acknowledged that, at some point while she and the children were living in Murfreesboro, the Tennessee Department of Children's Services briefly obtained legal custody of the children, although Mrs. Holton retained physical custody. Thereafter, on February 27, 1996, the defendant and Mrs. Holton agreed to the entry of an order by the Bedford County Juvenile Court granting Mrs. Holton custody of the children. The order stated that the defendant agreed "it would be in the best interest of the minor children that full custody be granted to the natural mother with visitation to be at the discretion of the mother."

The defendant continued to visit the children until the late summer or early fall of 1997, when Mrs. Holton obtained an order of protection and moved with the children to a different residence. In the fall of 1997, Mrs. Holton became romantically involved with Morris Rhodes. In October 1997 she and the children moved to Rhodes' home in Spring Hill, Tennessee.

---

[3] In his confession to the homicides in this case, the defendant admitted that he had been armed during the 1995 incident.

Although he knew that Mrs. Holton and the children had left their apartment in Murfreesboro, the defendant did not know where they had gone until late November of 1997. On Thanksgiving Day of that year, Mrs. Holton attempted to telephone the defendant at his uncle's garage in Shelbyville, where the defendant lived and worked. No one answered; however, the next day, the defendant returned Mrs. Holton's call. When Mrs. Holton told the defendant that the children "missed him and . . . wanted him to take them Christmas shopping," the defendant responded that "he didn't think anybody remembered he was still their dad," expressed concern that the children might be calling Mr. Rhodes "Dad," and said that he never wanted them to think that anyone else was their father. After reassuring the defendant about his relationship with the children, Mrs. Holton made arrangements for him to visit with the children on Sunday, November 30. The defendant telephoned Mrs. Holton again on Saturday, November 29, to inquire whether he should purchase the children clothing during the Sunday visit. He also asked permission to take the children to a movie in Shelbyville and remarked that he wanted to take the children by the garage where he lived and worked so they could see a dog he kept there.

As agreed, the defendant picked up the four children at a Murfreesboro Wal-Mart around 3 p.m. on Sunday. The children were excited about the visit. They ran to the defendant and hugged him. Two of the children gave the defendant a drawing that said "From Brent and Kayla. I love you Daddy." Although the defendant returned their embraces, Mrs. Holton said he appeared detached or "numb." The defendant agreed to return the children to Mrs. Holton at 9:30 p.m. at the Rutherford County Sheriff's Department.[4]

The defendant did not arrive as planned, however. Instead, he walked into the Shelbyville Police Department around 9:45 p.m. that night and told the dispatcher that he wanted to report a "homicide times four." The dispatcher described the defendant as calm and said he displayed no emotion. The dispatcher radioed for an officer and asked the defendant to wait in the lobby. Soon thereafter, an officer arrived and approached the defendant. After giving his name, address, and birth date, the defendant again indicated that he wished to report four homicides. When the officer asked how the defendant learned of the homicides, the defendant responded that he had killed his four children and then stood and placed his hands behind his back to allow the officer to handcuff him. The defendant confessed that, because his wife and the Department of Human Services had kept his children from him for the past few months, he had killed the four children with an SKS semi-automatic rifle at his uncle's automobile repair garage, Holton's Wrecker Service and Garage. The defendant indicated that the murder weapon and the bodies were still located inside the garage. The officers testified that the defendant appeared normal and calm during this exchange, that he spoke in a matter-of-fact tone, and that he never exhibited any bizarre behavior. One of the officers had been acquainted with the defendant for several years, and as the officers were leaving to investigate his claim, the defendant warned this officer of the "bomb" in the garage. At the garage, the officers discovered an SKS rifle and homemade incendiary devices. The police also located the bodies of

---

[4]As part of his own custody arrangements, Mr. Rhodes was scheduled to pick up his daughter at the Rutherford County Sheriff's department that same night.

the four children stacked underneath a plastic tarpaulin in the rear bay of the garage, the area of the garage where the defendant lived.

The defendant gave two statements to the police describing how he had killed his children. According to the defendant, he had contemplated killing the children in 1995 when he was driving them home to their mother following a weekend visit. On that occasion, he had been armed with a "Derringer," but he was unable to harm the children and instead surrendered the children to the police. He explained how, after his former wife obtained an order of protection against him, he had driven by her apartment in Murfreesboro "wanting something to happen," then "they were gone." When Mrs. Holton finally called him to arrange visitation Thanksgiving weekend, he decided to murder the children because they "had been taken away from me and given back to me, taken away from me and given back to me enough."

The defendant described how he had prepared for the killings by hiding his loaded SKS semi-automatic rifle behind a mattress in his living quarters at the garage, locating Mr. Rhodes' home in Spring Hill, and making five incendiary devices out of old oil filters. The defendant recalled that he had planned to kill his children, then travel to Spring Hill and use the incendiary devices to firebomb Mr. Rhodes' residence, and then drive to Murfreesboro and shoot Mr. Rhodes' young daughter, who would be at her mother's apartment in the public housing project in Murfreesboro until the scheduled custody change at the Sheriff's Department. The defendant parked a car next to the back door of his uncle's garage, headed in the direction he would need to travel, so that he could quickly leave the garage after he killed his children and commit the other criminal offenses.

The defendant recalled that, when he had picked up the children, his former wife "was dressed nicely. She was wearing makeup. She said she was happy. And that did not make me happy." After picking up the children at Wal-Mart and taking them to McDonald's and Funland, the defendant brought the children to his uncle's garage, where they visited with him and played with some tools. The defendant noted that he "had to play along to avoid any suspicion on the children's part." Around 7 to 7:30 p.m. the defendant left four-year-old Kayla and six-year-old Eric, who was hearing impaired, playing in the front bay of the garage with a hammer and other tools so they would be distracted and not hear the shots. The defendant then led twelve-year-old Stephen and ten-year-old Brent to the rear bay where he lived and had earlier hidden the SKS rifle. There he told the two older boys that he "had something for them" and instructed them to close their eyes and stand with their backs to him with Stephen, who was the taller, standing directly in front of Brent. Telling the boys "don't peek," the defendant pulled out the SKS rifle, knelt down and aimed the rifle. The defendant explained that he positioned the children to enable him to pierce both of their hearts with a single shot. With the barrel of the rifle touching Brent's back, he fired and then shot the boys again to be sure they were dead. After hiding the boys' bodies under a tarpaulin, the defendant brought Kayla and Eric to the rear bay and told them he had "something for them." When the children inquired about their older brothers, the defendant did not respond. Instead he positioned the taller Eric directly in front of Kayla, placed their hands over their eyes, told them not to peek, and knelt and fired the rifle into the two children. The defendant said that he shot Kayla a second time before

placing the bodies beside the older children under the tarpaulin. The defendant told the police that there was no enjoyment in killing the children.

The defendant recalled that he then straightened the area, washed, and prepared to complete the next phase of his plan by placing the re-loaded rifle and the firebombs in his car. After checking to see if anyone could have seen him at the garage and listening to his police scanner to see if anyone had reported gunshots, he left the garage. However, when it became apparent that there was not enough time to carry out his plan, he returned to the garage. The defendant explained, "I planned a lot of different scenarios and chose the one that time permitted. I was constantly subtracting - - going over what . . . options . . . - - were left." The defendant further observed, "I had done what I wanted to do. I wanted to shock [my ex-wife] to death. I was done. I was done." After considering suicide, he turned himself in to the police. He explained to the police that he had decided not to kill himself because someone who "was involved" should be left alive to help people "have a chance of understanding this." While professing love for his children, the defendant told the police that he felt no regret or remorse for killing them.

The defendant's account of the killings was supported by physical evidence. For example, spent bullets and cartridges recovered both from the victims' bodies and from the crime scene had been fired from the SKS rifle found by the police. Gunshot residue was found on the defendant's hands, and the children's blood was found on his clothing. Additionally, the results of the autopsies performed by forensic pathologist Dr. Charles Harlan were consistent with the defendant's story. Dr. Harlan testified that all four children died as the result of multiple gunshot wounds to the chest and/or abdomen. According to Dr. Harlan, the angle of the gunshot wounds was consistent with someone kneeling behind the victims and shooting upwards with the children standing in the positions described by the defendant. Dr. Harlan also opined that some of Kayla's wounds were consistent with someone shooting her from above as she lay on the garage floor.

The defendant declined to testify in his own behalf, but he offered the testimony of several witnesses, with the bulk of the defense proof aimed at establishing the defendant's insanity or diminished capacity and possible carbon monoxide poisoning.[5] The administrator of the Bedford County Jail testified that the defendant was placed on suicide watch during the first week after his arrest. The administrator noted that the defendant had been a quiet and cooperative inmate.

The defendant's uncle, who owned the garage where the killings occurred, testified that the defendant had lived in the rear bay of the garage for the four months preceding the killings. He had slept in an area draped with plastic tarpaulins at the back of the bay and had used a propane heater to warm this enclosed area. The defendant's uncle, who saw the defendant daily, testified that, after he was unable to see his children, the defendant became "quieter and withdrawn, unresponsive" and

---

[5]The defendant also presented the testimony of his parents' neighbor, who had known the defendant and his family in 1992; of a worker at a Murfreesboro liquor store, who described purchases made by Mrs. Holton; and of a former ATF agent, who opined that the "bomb" found at the garage would not have worked and was made by someone who knew "nothing about how explosives work."

had less energy. Nonetheless, on the day of the murder the defendant appeared very happy to see his children.

The defendant's uncle recalled that the police returned to the garage following the murders and reconstructed the defendant's living quarters "better and tighter than it originally was" and tested the propane heater inside the enclosed area. The temperature outside on the day of the murders was between forty and fifty degrees Fahrenheit, and the outside temperature was much colder at the time the police reconstructed the living quarters and tested the heater.

Dr. Donna Seger, a toxicologist, testified that carbon monoxide can affect memory, decrease IQ, and cause depression, psychosis and neurologic deficit. Dr. Seger, however, had not examined the defendant. Another witness, Dr. Leighton Sissom, a mechanical engineer who had examined the propane heater and the defendant's living quarters at the garage, testified that the ventilation of the area was inadequate for safe use of the heater and that it was probable that carbon monoxide had been present where the defendant slept. However, Dr. Sissom could not state that the defendant had been exposed to carbon monoxide on or before November 30, 1997, and conceded that the heater, when tested, was functioning properly and did not emit a significant amount of carbon monoxide.

The defendant also introduced the deposition of Dr. Howard S. Kirshner, a neurologist who had tested the defendant for symptoms of carbon monoxide poisoning. Dr. Kirshner described the effects of carbon monoxide poisoning ranging from coma and death to headaches, insomnia, problems with coordination, memory loss, and irritability. According to Dr. Kirshner, the defendant had reported experiencing headaches, irritability and sluggishness after purchasing the propane heater in October 1997 and had also described memory loss after the killings. However, except for difficulty with the fine motor coordination tests, the defendant performed normally on the tests administered by Dr. Kirshner. Results of an MRI on the defendant's brain were likewise normal, but Dr. Kirshner explained that changes to the brain caused by carbon monoxide poisoning would not necessarily appear on an MRI scan. Although the defendant's minor coordination problems were consistent with carbon monoxide poisoning, Dr. Kirshner could not diagnose the defendant with carbon monoxide poisoning.

Dr. Pamela Auble, a clinical neuropsychologist, also testified for the defense. She had interviewed and tested the defendant about six months after the offenses. Testing indicated that the defendant's IQ was superior (120) but that he had experienced deficits in processing information, in learning visual information, and in motor speed and manual dexterity. The defendant also experienced difficulty relating to people. Dr. Auble opined that these test results were consistent with exposure to carbon monoxide, although she was unable to definitively conclude that the defendant had been exposed to carbon monoxide. Rather, Dr. Auble opined that at the time these homicides were committed the defendant had been suffering from major depression caused by the termination of his marriage and "his concerns over [the] well-being of his children." Dr. Auble conceded that the defendant had not been depressed, anxious, or psychotic at the time of her June 1998 interview, stating, "at the time I saw him as he said it, really he didn't have to worry about his

children anymore and how they were being taken care of. In November of '97 that was a big concern for him." In short, at the time of Dr. Auble's interview, the defendant was "glad [his children] were dead."

Dr. William Kenner, a psychiatrist, testified that the defendant had been suffering from major depression at the time he killed his children. Dr. Kenner explained that a severely depressed parent may believe that his life, as well as that of his children, is worthless, and may kill his children to save them from the "terrible fate" of living. Dr. Kenner opined that the defendant matched the profile of a father who would kill his children, i.e., commit filicide, and emphasized that "the more a parent loves his or her children, the greater the risk is that they will kill them if they get severely depressed." Dr. Kenner based his opinion that the defendant had been suffering from major depression at the time of these killings upon reports that the defendant had been unable to sleep at night, that he had worked seven days a week except when he saw his children, that he had lost interest in other activities, that he had difficulty thinking and concentrating, that he had spoken slowly and stared into space, that he had lost weight and withdrawn from human contact, and that, in the month before the murder, the defendant had been found lying on the floor for no reason and had expressed a desire to commit suicide. Dr. Kenner believed that the defendant's depression had been exacerbated by carbon monoxide poisoning, which had also made the defendant more irritable. Dr. Kenner, however, conceded that a person can suffer from major depression and still be capable of distinguishing right from wrong. Indeed, Dr. Kenner acknowledged that parents who commit filicide "know it's against the law but [typically believe] it's done for almost the right reasons."

The State's rebuttal proof consisted of the testimony of Ralph Mosley, a safety consultant who had recreated the defendant's living quarters in the rear bay under conditions similar to those existing at the time of the killings in order to test for carbon monoxide contamination. The test revealed no evidence of carbon monoxide.

The State also presented the testimony of Dr. Daniel Martell, a forensic neuropsychologist, who had examined and tested the defendant. Dr. Martell noted that the defendant had a history of depression which was reflected in his medical and military records. Dr. Martell opined that, at the time of the crime, the defendant had been suffering from major depression, passive-aggressive personality disorder, and a schizoid personality. Dr. Martell explained that a person with a passive-aggressive personality disorder acts out anger or hostility in passive ways and that a person with a schizoid personality is a "loner," someone who isolates himself from others and has poor social skills. Dr. Martell dismissed the theory of carbon monoxide poisoning based upon the negative results of the tests performed by the safety consultant and the results of psychological tests which were entirely consistent with depression alone. As a result of his examination, Dr. Martell concluded that, despite his depression, the defendant knew the nature and the consequences of his behavior and also knew that killing his children was wrong. Dr. Martell stated that the defendant's depression did not preclude premeditation and pointed out that the defendant admitted he had contemplated murdering his children for two years, that the defendant had elaborately planned and prepared for the murders, that the defendant had formulated "a time chart" of how the crimes would be committed, that the defendant had targeted the hearts of the children, wounds certain to cause death,

that the defendant had concealed the bodies and the murder weapon from view and washed the blood from his body, and that the defendant had ultimately surrendered to the police, the surrender itself an acknowledgment of wrongdoing. As to Dr. Kenner's testimony that the defendant was motivated by love for his children, Dr. Martell pointed out that the defendant had planned and prepared to shoot Mr. Rhodes' daughter, to whom he was not related, and had intended to fire bomb Mr. Rhodes' home. Dr. Martell concluded that the defendant had been a very angry person, that he had committed these homicides to cause pain for his former wife and her new boyfriend, and that he had been capable of distinguishing right from wrong and of appreciating the wrongfulness of his conduct.

Based upon this proof, the jury found the defendant guilty on all four counts of first degree premeditated murder.

### B. Sentencing Phase

At the sentencing hearing the State sought to establish two aggravating circumstances. With respect to all four convictions, the State relied upon the "mass murder" aggravating circumstance, "which is defined as the murder of three (3) or more persons whether committed during a single episode or at different times within a forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12) (1997). With respect to the killings of ten-year-old Brent, six-year-old Eric, and four-year-old Kayla Marie, the State sought to establish that "the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn. Code Ann. § 39-13-204(i)(1) (1997).

The State relied upon the proof presented during the guilt phase of the trial. The State also replayed the audiotape of the defendant's November 30, 1997, confession that contained his date of birth and re-introduced the February 27, 1996, custody order of the Bedford County Juvenile Court that established the ages of the children.

Pursuant to the defendant's instructions, the mitigation proof was limited to testimony by the jail administrator that the defendant had been a good prisoner, that he had obeyed the rules, performed assigned tasks well, and interacted well with the prison staff. The administrator testified that the defendant was kept in isolation but was regularly visited by his family. The defendant did not dispute the applicability of the aggravating circumstances but instead argued that the aggravating circumstances did not outweigh the following mitigating circumstances beyond a reasonable doubt: (1) the defendant has no significant history of prior criminal activity; (2) the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance; (3) the murder was committed under circumstances that the appellant reasonably believed to provide a moral justification for his conduct; (4) the capacity of the appellant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of a mental disease or defect that was insufficient to establish a defense to the crime but substantially affected his judgment; and (5) any other mitigating circumstance raised by either the prosecution or the defense during both the guilt/innocence phase of the trial and the sentencing phase. See Tenn. Code Ann. § 39-13-204(j) (1997).

Based upon this proof, the jury imposed a sentence of death for each conviction. The defendant appealed, challenging both his convictions and sentences. The Court of Criminal Appeals affirmed, and the case was docketed in this Court. We affirm.

## II. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the convicting evidence. Specifically the defendant argues that the evidence is insufficient to support the jury's finding of premeditation because he had been suffering from severe depression at the time of the killings that prevented the exercise of reflection and judgment. The defendant declares that "[t]here is no way that a person with the defendant's past record, including giving up a military career for his children, could kill them after the exercise of reflection and judgment."

The defendant was convicted of four counts of first degree murder – "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997). A killing is premeditated if it

> is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997).

The proper inquiry for an appellate court reviewing a sufficiency challenge is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. State v. Carruthers, 35 S.W.3d at 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn from the evidence. See Carruthers, 35 S.W.3d at 557-58; Hall, 8 S.W.3d at 599. Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence. Id. Nor may this Court substitute inferences it draws from circumstantial evidence for those drawn by the trier of fact. See Carruthers, 35 S.W.3d at 557-58; Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The standard of appellate review is the same whether the

conviction is based upon direct or circumstantial evidence. State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). Finally, Tennessee courts have identified several circumstances that may be considered indicative of premeditation, including: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); see also State v. Dellinger, 79 S.W.3d 458, 492 (Tenn. 2002).

Evaluating the proof in this record in accordance with these standards we hold that the evidence clearly is sufficient to support the defendant's convictions. The proof has been thoroughly reviewed and need not be again recounted in detail. To summarize, however, the record reflects that the defendant admitted that he had contemplated and planned to murder his four young children. Indeed, the defendant told the police that he had been thinking about killing his children for two years. The defendant explained that he definitively resolved to kill his children after speaking with his former wife two days before the killings occurred. The record reflects that the defendant formulated the plan, that he concealed the loaded gun at the garage, that he called his former wife to let her know that he would be taking the children by the garage on the pretense of showing them a dog, that he lured the children, two at a time, to the rear bay of the garage promising them a surprise, that he positioned the children so that one shot would pierce the hearts of both, that he gave the two younger children a drill and a hammer to play with so they would be distracted and not hear their brothers being shot, that he concealed the bodies of his older sons before persuading the two younger children to come to the rear bay of the garage, and that by killing the children he intended to "shock" his ex-wife "to death" and to end the custody disputes, explaining that his children had been "had been taken away from me and given back to me, taken away from me and given back to me enough." The defendant also concealed the victim's bodies and "squared away" the crime scene, prepared and planned to commit other related crimes by locating the residence of his former wife, by constructing homemade incendiary devices to firebomb that residence, and by parking a vehicle in a way that would facilitate his ability to commit all the crimes he had planned.

While all the mental health experts testified that the defendant had been suffering from depression at the time he killed his children, none testified that the depression rendered him incapable of premeditation, of distinguishing right from wrong, or of appreciating the wrongfulness of his conduct. To the contrary, Dr. Martell opined that the defendant had been capable of forming the requisite mental intent for premeditated first degree murder and of distinguishing right from wrong and of appreciating the wrongfulness of his conduct. Dr. Auble agreed that the defendant had been capable of appreciating the wrongfulness of his conduct and of distinguishing right from wrong. Furthermore, she conceded that the defendant had not been depressed when she interviewed him some months after the killings because he no longer had to worry about his children and that he was "glad [his children] were dead." Finally, by explaining that he had killed his children to end the custody dispute and to shock his former wife, the defendant himself contradicted Dr. Kenner's opinion that the killings were altruistic. Furthermore, the defendant's behavior immediately after the killings indicate that he was able to distinguish right from wrong and to appreciate the wrongfulness of his conduct. Before leaving the garage after the killings, the defendant listened to

the police scanner in his car to determine whether anyone had reported hearing gunshots. The defendant later surrendered to police, walking into the sheriff's department and reporting a "homicide times four." Officers testified that the defendant appeared normal and calm, spoke in a matter-of-fact tone, and never exhibited any bizarre behavior. Indeed, the defendant warned one of the officers, whom he had known for several years, of the homemade incendiary devices in the garage. In sum, there is sufficient, indeed overwhelming, evidence in the record to support the jury's verdict finding the defendant guilty of four counts of premeditated first degree murder. This issue is without merit.

### III.  Constitutionality of Insanity Defense

The defendant next argues that, as applied in the narrow context of a premeditated first degree murder case, the statutory insanity defense, Tennessee Code Annotated section 39-11-501, violates a criminal defendant's constitutional right to due process. According to the defendant, to prove premeditation, which requires the exercise of reflection and judgment, the prosecution must prove sanity. The defendant therefore contends that the statute requiring the defense to prove insanity by clear and convincing evidence is unconstitutional in a premeditated first degree murder case because it shifts the burden of proof for an essential element of the offense from the State to the defense. We disagree.

> Analysis of this issue begins with the challenged statute, which provides as follows:
> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501 (1997). Under this statute, insanity is an affirmative defense; sanity is not an element of the offense of first degree murder. State v. Flake, 88 S.W.3d 540, 551 (Tenn. 2002). This is important because the United States Supreme Court has upheld the constitutionality of statutes that require a criminal defendant to prove the affirmative defense of insanity beyond a reasonable doubt. Leland v. Oregon, 343 U.S. 790, 791-93 (1952). It is logical to conclude that statutes requiring a criminal defendant to prove the affirmative defense of insanity by clear and convincing evidence also are constitutional. See, e.g., United States v. Amos, 803 F.2d 419, 421 (8th Cir. 1986) ("The Supreme Court in Leland . . . held that a criminal defendant may, consistent with due process, be required to prove his [in]sanity beyond a reasonable doubt. It is axiomatic, therefore, that a lesser standard of proof, such as the clear and convincing standard, may be imposed.")

Since Leland, the Supreme Court has clarified that placing the burden of proving an affirmative defense upon a criminal defendant will be unconstitutional only if proving the affirmative defense necessarily negates an essential element of the offense. See, e.g., Patterson v. New York, 432 U.S. 197, 206-07 (1977). Applying this standard, the Court of Criminal Appeals has in a second degree murder case upheld the constitutionality of the statutory insanity defense in Tennessee. State v. Perry, 13 S.W.3d 724, 739 (Tenn. Crim. App. 1999). We reach the same result in this case. Proving insanity does not necessarily negate the element of premeditation. It is possible for a criminal defendant to commit a premeditated murder after the exercise of reflection and judgment but not be capable of appreciating the wrongfulness of the act. For example, an insane criminal defendant could be acting under the delusion that by committing the murder he or she will be fulfilling his or her duties as a law enforcement officer. The statutory insanity defense does not unconstitutionally shift the burden of proof to the defendant to negate an essential element of the offense of first degree murder. This issue is without merit.


### IV. Residual Doubt

In what is another attack on the strength of the evidence, the defendant argues that there is significant residual doubt concerning his mental state at the time of the killings and therefore his guilt of the offenses of first degree murder. The defendant argues that this "residual doubt" proof renders the death sentences "inappropriate" and warrants imposition of life sentences. We disagree.


"'Residual doubt evidence,' in general, may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." State v. McKinney, 74 S.W.3d 291, 307 (Tenn. 2002) (citing State v. Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001)). A defendant may "present evidence at a re-sentencing hearing to establish residual doubt as a nonstatutory mitigating circumstance." Hartman, 42 S.W.3d at 55. Indeed, under Tennessee law, a defendant "has the right to present at the sentencing hearing, whether by the jury which heard the guilt phase or by a jury on re-sentencing, evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability." Hartman, 42 S.W.3d at 56 (quoting State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995)).

Like McKinney, however, this case is not controlled by either Hartman or Teague. In Hartman, the defendant sought to introduce at a resentencing hearing evidence that the prosecutor had purchased the testimony of a key witness at the original trial. 42 S.W.3d at 55. In Teague, the defendant tried to introduce alibi evidence at a resentencing proceeding. 897 S.W.2d at 256. The present case does not involve a resentencing procedure, nor does it involve a trial court erroneously precluding a defendant from introducing residual doubt evidence or from making an argument based upon residual doubt. Here, the defendant introduced evidence during the guilt phase of the trial regarding his mental state at the time of the killings, and the trial court properly allowed the defendant to refer to this evidence in argument before the same jury at the sentencing phase of the trial. McKinney, 74 S.W.3d at 308 ("[W]here a defendant seeks to argue residual doubt based on

the evidence introduced or in response to an argument made by the prosecution, the trial court should exercise its discretion by resolving any doubt in favor of the defendant's argument.")  By imposing the death sentence, the jury simply resolved any "residual doubts" concerning the defendant's mental state at the time of the killings in favor of the State. As previously explained, the evidence is sufficient to support the jury's finding as to premeditation.

Nonetheless, in assessing this residual doubt claim and in assessing whether the evidence supports the jury's finding that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, defense counsel urges this Court to consider the defendant's refusal to allow counsel to present extensive mitigating evidence concerning his relationship with his former wife and children. We decline.  As the Court of Criminal Appeals recognized, "abundant evidence" was presented during the guilt phase regarding Mrs. Holton's inadequacies as a mother and the defendant's loving relationship with his children.  "[G]iven that this was not a resentencing hearing, the reality is that the sentencing jury had already heard the testimony . . . and had reconciled it in favor of the State's theory of guilt and against the defendant's theory of innocence." McKinney, 74 S.W.3d at 308.  Furthermore, a criminal defendant has the right and the authority to make substantive decisions concerning the presentation of his or her defense, including the right to forego the presentation of mitigating evidence during the sentencing phase of a capital trial. Zagorski v. State, 983 S.W.2d 654, 658 (Tenn. 1998).  Defense counsel and the trial court complied with Zagorski and insured that the defendant's decision was voluntary, knowing, and intelligent.  A defendant's subsequent regret or doubt about the wisdom of foregoing the presentation of mitigating evidence is not a basis for relief. Id. at 658-59.  This issue is without merit.

## V.  Constitutionality of the Capital Sentencing Statutes: Apprendi and Ring

The defendant next claims that Tennessee's capital sentencing scheme is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002).  In support of this claim, the defendant makes four arguments: (1) the statute does not mandate that aggravating circumstances be charged in the indictment; (2) the statute mandates that appellate judges, not jurors, conduct comparative proportionality review; (3) the statute does not include a "scale" for determining whether aggravating circumstances outweigh mitigating circumstances; and (4) the statute does not require that the prosecution prove sanity beyond a reasonable doubt.  As the State points out, because the defendant failed to raise these arguments in the Court of Criminal Appeals, waiver could be applied.  Nonetheless, we will consider the defendant's arguments in turn and explain why none has merit.

First, the defendant contends that the failure to include aggravating circumstances in the indictment violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as well as Article I, section 14 of the Tennessee Constitution.  The defendant recognizes that this Court recently rejected this argument, stating, "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." See State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002).  The defendant, however, argues that Dellinger is

-14-

incorrect in light of the United States Supreme Court's later decision in Ring, which extended the principles of Apprendi to capital sentencing and required that aggravating circumstances, as the functional equivalents of elements, be found by a jury beyond a reasonable doubt.

In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. This Court explained in Dellinger that the capital sentencing scheme in Tennessee is consistent with Apprendi because: (1) the holding in Apprendi applies only to enhancement factors used to impose a sentence above the statutory maximum; (2) the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly; and (3) Tennessee's capital sentencing procedure requires both that a jury find statutory aggravating circumstances based upon proof beyond a reasonable doubt and that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Dellinger, 79 S.W.3d at 466-67.

After the release of our opinion in Dellinger, the United States Supreme Court issued its opinion in Ring. The narrow question presented in Ring was "whether [an] aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." 536 U.S. at 597. The Court in Ring pointed out the limited nature of the issue, noting that of the thirty-eight states with capital punishment, twenty-nine, including Tennessee, "commit sentencing decisions to juries." Id. at 608 n.6. The Court also emphasized that Ring did not contend that his indictment was constitutionally defective and noted that the Fourteenth Amendment has not been construed to apply to the states the Fifth Amendment right to "'presentment or indictment of a Grand Jury.'" Id. at 597 n.4 (quoting Apprendi, 530 U.S. at 477 n.3). The narrow holding of the Court in Ring is that because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury. Id. at 609. Contrary to the defendant's assertions, Ring does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards. See United States v. Bernard, 299 F.3d 467, 488 (5th Cir. 2002) ("Ring did not hold that indictments in capital cases must allege aggravating and mental state factors."); Porter v. Crosby, 840 So. 2d 981, 986 (Fla. 2003) (stating that neither Apprendi nor Ring require aggravating circumstances be alleged in the indictment); Terrell v. State, 572 S.E.2d 595, 602 (Ga. 2002) (same). Therefore, Ring provides no relief to the defendant and does not invalidate this Court's holding in Dellinger. See State v. Carter, 114 S.W.3d 895, 910 n.4 (Tenn. 2003) (applying Dellinger to reject a claim that Ring requires aggravating circumstances be included in the indictment).

Next the defendant contends that under Apprendi and Ring, Tennessee's capital sentencing scheme violates the Sixth Amendment to the United States Constitution because the statute does not require the question of comparative proportionality to be decided by a jury upon proof beyond a reasonable doubt. We disagree.

The holdings of Apprendi and Ring are summed up by the following language from Ring: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact– no matter how the State labels it– must be found by a jury beyond a reasonable doubt." Ring, 536 U.S. at 602. Statutory comparative proportionality review is not a fact upon which "an increase in the defendant's authorized punishment" is contingent. Appellate courts conducting statutory comparative proportionality review determine whether "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." State v. Godsey, 60 S.W.3d 759, 782 (Tenn. 2001); State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1996). If the case is found to be disproportionate under this standard, the sentence is reduced to life imprisonment or life imprisonment without the possibility of parole. See Tenn. Code Ann. § 39-13-206(d)(2) (1997); Godsey, 60 S.W.3d at 793. Therefore, appellate courts conducting comparative proportionality review have only two options – reduce the sentence of death or affirm the sentence of death imposed by the jury. Appellate judges do not find facts that increase the defendant's authorized punishment. Indeed, comparative proportionality review becomes relevant only after a jury has imposed the maximum sentence – death. Thus, allowing appellate judges to conduct statutory comparative proportionality review does not violate the holdings of Apprendi and Ring. See Morrison v. State, 583 S.E.2d 873, 879 (Ga. 2003) (rejecting the defendant's argument that a statute allowing appellate judges to perform comparative proportionality review violates Apprendi and Ring).

Furthermore, this Court has previously rejected the defendant's next contention, that the capital sentencing statute fails to provide sufficient guidance and direction to the jury as to the weighing process. See, e.g., State v. Smith, 857 S.W.2d 1, 21-22 (Tenn. 1993). Despite the defendant's contentions to the contrary, neither Apprendi nor Ring directly address this issue. The capital sentencing statute in Tennessee is consistent with these decisions in that it allows imposition of a death sentence only when a jury determines the existence of aggravating circumstances and that these aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(g)(1) (1997) (emphasis added). This process is entirely consistent with Apprendi and Ring.

Also instructive is the following analysis of the Nebraska Supreme Court as to whether Apprendi and Ring preclude appellate comparative proportionality or require precise standards as to weighing aggravating versus mitigating circumstances:

[W]e understand Ring as recognizing a Sixth Amendment right to a jury determination of the existence of aggravating circumstances which determine "death eligibility," because in the absence of at least one such circumstance, the death penalty cannot be imposed. It is the determination of "death eligibility" which exposes the defendant to greater punishment, and such exposure triggers the Sixth Amendment right to jury determination as delineated in Apprendi and Ring. In contrast, the determination of mitigating circumstances, the balancing of aggravating circumstances against mitigating circumstances, and proportionality review are part of the "selection decision" in capital sentencing, which, under the current and prior

-16-

statutes, occurs only after eligibility has been determined. These determinations cannot increase the potential punishment to which a defendant is exposed as a consequence of the eligibility determination. Accordingly, we do not read either Apprendi or Ring to require that the determination of mitigating circumstances, the balancing function, or proportionality review be undertaken by a jury.

State v. Gales, 658 N.W.2d 604, 626-27 (Neb. 2003) (citation omitted). This reasoning is compelling and is fully applicable to Tennessee's capital sentencing scheme. Thus, the defendant's contentions that the capital sentencing statute is unconstitutional because it permits judges rather than jurors to conduct proportionality review and fails to provide a scale for determining whether aggravating circumstances outweigh mitigating circumstances are without merit.

Likewise without merit is the defendant's assertion that the statutory insanity defense, Tennessee Code Annotated section 39-11-501, which requires the defendant to prove insanity by clear and convincing evidence, is unconstitutional under Apprendi and Ring. For the second time, the defendant contends that the statute is unconstitutional because it does not require the prosecution to prove sanity to a jury beyond a reasonable doubt. Again, we must disagree. Insanity is an affirmative defense, not a fact that, if found, increases a defendant's authorized punishment. Flake, 88 S.W.3d at 551. Therefore, requiring a defendant to prove insanity, an affirmative defense analogous to a mitigating circumstance, does not violate Apprendi or Ring.

## VI. Mandatory Review

Tennessee Code Annotated § 39-13-206(c)(1) (1997) mandates that this Court determine (1) whether the sentence of death was imposed in any arbitrary fashion; (2) whether the evidence supports the jury's finding of statutory aggravating circumstances; (3) whether the evidence supports the jury's finding that aggravating circumstances outweigh any mitigating circumstances; and (4) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

A thorough review of the record reveals that the evidence is sufficient to support the jury's finding of the aggravating circumstances beyond a reasonable doubt. As to all four convictions of first degree murder, the jury found that the defendant had committed "mass murder," "which is defined as the murder of three (3) or more persons whether committed during a single episode or at different times within a forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12) (1997). As to three of the convictions, the jury found that "the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn. Code Ann. § 39-13-204(i)(1) (1997). The defendant did not contest the applicability of these aggravating circumstances, both of which involve objective, readily ascertainable facts. Furthermore, the evidence is sufficient to support the jury's findings that the aggravating circumstances so found outweighed mitigating circumstances beyond a reasonable doubt. Additionally, there is no indication that the sentences of death were imposed in an arbitrary fashion.

Finally, the sentences of death in this case are not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D)(1997). A death sentence is disproportionate only if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Id. Thus, the duty of an appellate court is not to assure "that a sentence less than death was never imposed in a case with similar characteristics," but instead to "assure that no aberrant death sentence is affirmed." Id.

While there is no mathematical or scientific formula involved in comparing similar cases, this Court generally considers: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. See Vann, 976 S.W.2d at 107 (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Moreover in conducting this review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Carruthers, 35 S.W.3d at 570 (citing Bland, 958 S.W.2d at 666).

Considering the record in this case in light of these factors, the proof shows that the thirty-six-year-old, highly intelligent white male defendant meticulously planned and carefully premeditated the murders of his four young children. The defendant admitted that his motivation was anger at his former wife for removing the children from his custody and his desire to "shock" his former wife "to death." To accomplish these murders, the defendant exploited the trust and love of his children. He agreed to visit with them and take them Christmas shopping. He enticed them to the back bay of the garage on the pretense that he had a surprise for them, and used this pretense to carefully position the children so that one shot would pierce two hearts. To fully ensure their death, the defendant repeatedly shot the unarmed, unresisting children at close range with an SKS semi-automatic rifle. While the mental health experts agreed that the defendant had been depressed at the time he committed these crimes, there was no evidence indicating that he was incapable of distinguishing right from wrong or of appreciating the wrongfulness of his conduct. Instead, the proof indicated that he methodically devised a plan and carefully carried it out against the vulnerable, unsuspecting victims, all the while realizing the consequences of his actions. While the defendant told police he took no enjoyment from committing these murders, he certainly expressed no remorse for his actions, telling Dr. Auble several months later that he was "glad [his children] were dead." Dr. Auble testified that the defendant had not been suffering from depression when he made that

-18-

comment. While there is no evidence in the record regarding the defendant's amenability to rehabilitation, the record reflects that the defendant had cooperated with the police, confessing to the crimes and warning officers about the homemade incendiary devices. Furthermore, the jail administrator testified that the defendant had caused no problems during his incarceration. While no two capital cases and no two defendants are alike, the following cases and defendants share several similarities with this case and this defendant.

In State v. Black, 815 S.W.2d 166 (Tenn. 1991), the defendant shot and killed his girlfriend and her two daughters, nine and six years old. The defendant was motivated by his anger at his girlfriend's attempt to reconcile with her ex-husband, the father of her children. The defendant had a prior conviction involving a shooting and was on a weekend furlough from the Metropolitan Workhouse in Davidson County when he committed these murders. The defendant denied any involvement in the murders, but he was convicted of first degree premeditated murder as to each victim. The defendant presented the testimony of former teachers, friends, and family members in mitigation. This testimony portrayed the defendant as a good student, a good father, a good provider, a good inmate, a responsible, polite, friendly, helpful, and nonviolent person who had experienced a religious conversion while incarcerated. Nevertheless, the jury imposed a death sentence for the murder of the six-year-old child and sentences of life imprisonment on the remaining convictions. In imposing the death sentence, the jury relied upon five aggravating circumstances, including the young age of the victim and the defendant's commission of mass murder. See Tenn. Code Ann. § 39-13-204(i)(1), (2), (5), (6), (7), (12) (1989).

In State v. Oscar Franklin Smith, 868 S.W.2d 561 (Tenn. 1993), the jury imposed the death sentence upon the forty-year-old defendant who shot and stabbed his estranged wife and his thirteen- and sixteen-year-old stepsons. The murders were motivated by the defendant's anger at being separated from his wife. The defendant had previously assaulted the victims and, as a result, was facing charges for aggravated assault at the time he committed the murders. Witnesses testified that for several months prior to the murder, the defendant had publicly plotted to kill the victims. Expert testimony revealed that he mutilated two of the bodies shortly after the victims' deaths. The defendant denied his involvement in the murders. Nevertheless, the jury found him guilty of first degree premeditated murder as to each victim and imposed a sentence of death for each murder, finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, that the murder was committed for the purpose of avoiding arrest or prosecution, that the murders were committed during the perpetration of another felony, and that the defendant had committed mass murder. See Tenn. Code Ann. § 39-13-204(i)(5), (6), (7), (12) (1989).

In State v. Keen, 31 S.W.3d 196 (Tenn. 2000), the twenty-seven-year-old defendant was convicted of first degree murder during the perpetration of a rape of his girlfriend's eight-year-old daughter. In sentencing the defendant, the jury applied two aggravating circumstances, including the young age of the victim, and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Id. at 205; see Tenn. Code Ann. § 39-13-204(i)(1), (5) (1989). The evidence established that the defendant raped the child while choking her, possibly with a shoelace. Id. at 203-04. When the child stopped

breathing, the defendant threw her into a river. Id. at 203. An autopsy revealed multiple scrapes and bruises to the child's face and neck and a deep ligature mark around the front of her neck. Id. at 204. The autopsy further indicated that the child was alive when she was thrown into the river. Id. The defendant was highly intelligent but was suffering from attention deficit disorder, post-traumatic stress disorder, and serious depression. Id. Additionally, the defendant had been sexually abused as a child. Id. at 205. The defendant had no prior criminal record and demonstrated remorse following the offense. Id. at 221.

In State v. Vann, 976 S.W.2d 93 (Tenn. 1998), the defendant was convicted of felony murder during the perpetration of a rape of his eight-year-old daughter. The proof indicated that the victim's death was the result of ligature strangulation. The jury applied three aggravating circumstances in sentencing the defendant to death: the young age of the victim, the defendant's prior convictions for aggravated rape, and the fact that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. § 39-13-204(i)(1), (2), (5) (1997). Medical testimony indicated that the condition of the victim's anus was consistent with ongoing, repeated anal penetration. Witnesses testified that the defendant showed no remorse at the hospital about his daughter's death, and nothing in the record indicated a capacity for rehabilitation.

In State v. Irick, 762 S.W.2d 121 (Tenn. 1988), the twenty-six-year-old defendant was babysitting a friend's children, including the victim. The defendant raped the seven-year-old victim vaginally and anally. The victim suffocated as the defendant held his hand over her mouth to keep her from screaming. The defendant was convicted by a jury of first degree felony murder and aggravated rape. Following a sentencing hearing, the jury found four aggravating circumstances: the victim was less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed during the perpetration of a felony. See Tenn. Code Ann. § 39-2-203(i)(1),(5), (6), (7) (1982). The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense, and that he had a past mental impairment.

In State v. Coe, 655 S.W.2d 903 (Tenn. 1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an isolated spot, and raped her. When Coe completed the rape, the victim told him that Jesus loved him. At that point, the defendant strangled the victim until she turned blue. When the victim did not immediately die from the strangulation, he stabbed her in the neck with a pocket knife and watched as she suffered agonizing death throes. Eventually, he left her to die in the wooded area. Coe was convicted of first degree murder, kidnapping, and aggravated rape. Following the sentencing hearing the jury sentenced the defendant to death upon finding four aggravating circumstances: the victim was not twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed while the defendant was

engaged in committing or attempting to commit rape. See Tenn. Code Ann. § 39-2-203(i)(1), (5),(6), (7) (1982). As mitigating evidence the defendant claimed that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense.

In State v. Payne, 791 S.W.2d 10 (Tenn. 1990), the twenty-year-old defendant stabbed to death his girlfriend's twenty-eight-year-old neighbor and the neighbor's two-year-old daughter. The jury imposed the death penalty for each conviction, and as to the two-year-old child, relied upon the age of the victim, the fact that the defendant knowingly created a great risk of death to two or more persons other than the victim, and that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(1), (3), & (5) (1982); see also State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (imposing the death sentence based in part on the mass murder aggravating circumstance where the defendants shot two men, strangled the mother of one of the men, and buried all three victims alive).

Like the present case, the defendant in each of these cases murdered a minor, indeed in many instances a very young child. In most of these cases, as in this case, the victim was either well-acquainted with the defendant or related to the defendant. In many of these cases, the jury relied upon the age of the victim aggravating circumstance, and in two cases, the jury relied upon the mass murder aggravating circumstance. Unlike the present case, in many of these cases the defendants denied involvement in the crime and presented extensive mitigating proof. While no two capital cases are identical, we have compared the circumstances of the present case with the circumstances of the cases set out above and others not herein detailed and conclude that this case, taken as a whole, is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the defendant's sentences of death are not disproportionate considering the circumstances of the crime and the defendant.

## VII.  Conclusion

We have considered the entire record in this case and find that the sentences of death were not imposed in any arbitrary fashion, that the sentences of death are not excessive or disproportionate, that the evidence supports the jury's finding of the statutory aggravating circumstances and the jury's finding that these aggravating circumstances outweigh mitigating factors beyond a reasonable doubt. We have also considered all the defendant's assignments of error and conclude that none has merit. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Norma McGee Ogle and joined in by Judge David H. Welles and Judge Jerry L. Smith. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentences of death shall be carried out as provided by law on the 3rd day of June, 2004, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE