IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 3, 2004 Session

## STATE OF TENNESSEE v. RAYMOND DOUGLAS MYERS, SR.

**Direct Appeal from the Circuit Court for Putnam County**
**No. 01-0401A     John Turnbull, Judge**

_____

**No. M2003-01099-CCA-R3-CD - Filed April 29, 2004**

_____

The Defendant, Raymond Douglas Myers, Sr., was found guilty by a jury of three counts of first degree murder, two counts of felony murder, one count of aggravated arson, and one count of conspiracy to commit murder. The trial court merged the convictions for felony murder and conspiracy to commit murder into the three first degree murder convictions. After a sentencing hearing, the trial court imposed consecutive sentences of life without the possibility of parole for each murder conviction, and a consecutive twenty-four year sentence for the aggravated arson conviction. In this direct appeal, the Defendant argues that the evidence is insufficient to support his convictions, that Tennessee's first degree murder sentencing statute is unconstitutional, and that the trial judge improperly instructed the jury regarding the State's burden of proof. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

John Appman, Jamestown, Tennessee, for the appellant, Raymond Douglas Myers, Sr.

Paul G. Summers, Attorney General and Reporter; Elizabeth Marney, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Larry G. Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A brief overview will be helpful to understanding this case. On July 30, 1999, the McMinnville Fire Department responded to a house fire. Inside the house, firefighters discovered the bodies of Dianne Watts, her daughter Jessica Watts, and Chelsea Smith, Jessica Watt's friend who spent the night with her on July 29. Dianne Watts, her daughter Jessica, and Dianne Watt's boyfriend, the Defendant, lived together in the house that burned. The Defendant had lived there about six years. Investigators with the fire department determined that the fire was deliberately set

with an "ignitable liquid fuel" based upon burn patterns and the presence of an accelerant in the bedrooms, in the hallway, on the bed, and on the clothes of Chelsea Smith and Jessica Watts. Firemen also recovered a metal baseball bat from the hallway and a torque wrench from the area immediately at the front door of the house.

Dr. Bruce Levy, who performed the autopsies on the victims' bodies, testified that he identified five injuries to Chelsea Smith's head and one to her groin. She died as a result of the blunt-force injuries and smoke inhalation. Dr. Levy testified that the injuries to Ms. Smith were consistent with full-swing blows from the torque wrench. The evidence of smoke inhalation indicates that Ms. Smith was alive when the fire was set.

Dr. Levy also testified that he found two injuries on Jessica Watts' head that he believed to have been caused by blows from the torque wrench. The immediate cause for Ms. Watts' death was smoke inhalation.

With respect to Dianne Watts, Dr. Levy found two severe injuries to her head that he believed were caused by the baseball bat. Raymond DePriest, a forensic scientist with the Tennessee Bureau of Investigation, testified that a DNA analysis of blood from the baseball bat showed the blood to belong to Dianne Watts.

Four persons were indicted for the murders, arson, and conspiracy to commit the murder of Diane Watts: the Defendant, the Defendant's friend Johnny Lee Lewis, the Defendant's mother Clementine Myers, and the Defendant's brother Gary Myers. The State's theory was that the four of them conspired to kill Dianne Watts because she had information regarding criminal activity in which they engaged. Gary Myers' house had been burglarized, and he and Clementine Myers believed that Ms. Watts was responsible. Gary Myers had been investigated for bankruptcy fraud and food stamp fraud, and the conspirators thought Ms. Watts had information related to the investigation for fraud.

The State offered the testimony of the Defendant's estranged wife, who heard him and Johnny Lewis talking about how Ms. Watts was "running her mouth," and that Clementine Myers wanted Ms. Watts "shut up." The day before the murder, Mr. Lewis bought approximately five two-gallon jugs of gasoline. Shortly after the murders, the Defendant gave Mr. Lewis nine hundred dollars that came from Clementine Myers. On the morning following the murders, Gary Myers called the Defendant at approximately 6:20 a.m. and tape recorded a brief portion of their conversation, which the State characterized as an attempt to create an alibi for the Defendant.

Throughout the trial, the prosecution offered the testimony of witnesses who had heard the Defendant, Johnny Lewis, and Clementine Myers make incriminating statements and threats regarding Ms. Watts. Several witnesses testified to details of the burglary of Gary Myers' house and the exchange of a stolen tractor for methamphetamine by the Defendant and Mr. Lewis. These facts were relevant to the conspiracy charge, but have little, if any, bearing on the resolution of the issues raised by the Defendant in this appeal.

The first issue raised by the Defendant is whether the evidence is legally sufficient to support his convictions of the murders of Dianne Watts, Jessica Watts, and Chelsea Smith and his conviction for aggravated arson. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Our criminal code defines first degree murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Given the testimony concerning the injuries to the victims and the cause of the fire, the evidence clearly supports a finding that the killings were premeditated and intentional. Aggravated arson is the knowing damage of a structure by fire for an unlawful purpose where there is a person present in the structure. See Tenn. Code Ann. § 39-14-301(a)(2), -302(a)(1). The evidence reflects that the fire was intentionally set with the use of accelerants. Dr. Levy testified that two of the victims were alive at the time the fire was set. Therefore, the proof is sufficient to support a finding that aggravated arson was committed. The question that remains is whether the evidence demonstrated beyond a reasonable doubt that the Defendant committed the offense.

To connect the Defendant to the murders and the arson, the State first called Brandy Hodges, who lived near the house in which the victims died, which was rented by Dianne Watts. Ms. Hodges testified that she got home at approximately 6:00 on the evening of July 29. At around 11:00 that night, she saw Dianne Watts' vehicle drive into the driveway. Thereafter at about 1:00 a.m., she heard the Defendant's truck drive into the driveway of Ms. Watts' house. She said that she knew it was the Defendant's truck because it had "an extremely loud engine exhaust" on it, and she "had

become pretty used to hearing it." Also, she never heard her dog bark, and her dog always barked when unfamiliar people were near. On cross-examination, she admitted that she did not see the Defendant's truck or the Defendant that night. She also admitted that she had heard other loud trucks that sounded similar to the Defendant's.

Shawn McCormick testified that he helped the Defendant work on a vehicle about two weeks prior to the murders. They were using Mr. McCormick's tools, including a cracked torque wrench. Mr. McCormick left the torque wrench in the basement of the house where the Defendant lived with Ms. Watts. Mr. McCormick returned some time prior to the murders to retrieve his tool box, but he discovered that his torque wrench was missing. Several people, including Ms. Watts' daughter, her brother, her nephew, and her sister, testified that they had been in her house shortly before the murders, but had not seen a torque wrench.

The State also offered the testimony of several witnesses who had heard the Defendant threaten to harm Ms. Watts. Minnie McReynolds testified that the Defendant had been at her house putting up molding a week or two before the murders. She said that Ms. Watts arrived and asked the Defendant when he would be home, and the Defendant stated that he was not going to go home with her. Ms. McReynolds testified that after Ms. Watts left, she heard the Defendant say, "One of these days I'm going to kill that bitch." When Ms. Reynolds asked him why he was so upset, he told her about a court date he had coming up.

Shonda Myers, the Defendant's daughter, testified that the Defendant treated Ms. Watts "like a dog." She also said that she had heard the Defendant threaten to kill Ms. Watts, but she did not believe that he meant it. She told investigators that, about two weeks before the murders, she heard the Defendant say that "if people kept on messing with him, he'd burn them out."

Diana Ross, who cut the hair of both the Defendant and Ms. Watts, testified that three or four weeks before the murders, the Defendant told her that "he was going to burn her house down with her in it." Ms. Ross said that the Defendant was upset because his son Raymond was living with Ms. Watts at the time.

The Defendant's estranged wife, Shirley Humphrey, testified that she heard the Defendant and Mr. Lewis talking about how Ms. Watts was "running her mouth," "pissing a lot of people off," and needed to be "shut up." On one occasion, she was present while Mr. Lewis was on the phone, and he told her he was talking to the Defendant. She heard Mr. Lewis tell the Defendant to "make sure the little girl isn't there."

Dan Ogle, an agent with the Tennessee Bureau of Investigation, interviewed the Defendant as part of his investigation of the murders. He testified that he met the Defendant outside the police station. He noticed that, while still in the parking lot, the Defendant removed his belt and placed it inside his truck. This truck was later searched by a police dog trained to pick up the scent of accelerants. The dog focused intently on the belt that it found in the Defendant's truck. Later testing in a laboratory did not indicate the presence of an accelerant on the Defendant's belt. However,

Randall Nelson, the TBI laboratory technician, testified that it was possible that the belt contained such a low level of the accelerant that his instruments failed to pick it up, or it may have evaporated.

More importantly, Agent Ogle testified that he asked the Defendant whether he had any tools at the house where he lived with Ms. Watts. The Defendant replied:

> Shawn McCormick brought tools to the house and fixed the rear-end of my four-wheel-drive. Shawn McCormick left a torque wrench at my house approximately one or two months before this fire. Dianne brought this wrench from the basement to the livingroom and put it next to the front door by the curtain vent. If you entered the front door, this tool would be on your right. The color of the tool was silver. Shawn used the wrench, but I never did use it.

Agent Ogle testified that he did not mention the torque wrench to the Defendant, and no one outside of law enforcement knew its significance as one of the murder weapons. He further stated that the Defendant described the exact location where the investigators found the torque wrench. However, according to his statement, the Defendant had not been in Ms. Watts' house since the Wednesday before the murders, July 28, 1999. In his statement, the Defendant also denied ever threatening to kill Ms. Watts or "burn her out." Agent Ogle interviewed the Defendant on the day the bodies were discovered. He said the Defendant showed no emotion regarding the deaths of Ms. Watts and her daughter, Jessica.

The Defendant presented two alibi witnesses, Teresa Myers (his ex-wife), and her mother, Clara Whipple. They both testified that the Defendant stayed at their house in Winchester on July 29, 1999. Ms. Whipple testified that she awoke the Defendant at 6:00 or 6:30 on the morning of July 30.

Viewing the totality of this evidence in the light most favorable to the State, we conclude that the evidence is legally sufficient to support the findings of guilt beyond a reasonable doubt. Shortly before the murders, the Defendant threatened to harm Ms. Watts, even saying "he was going to burn her house down with her in it." Shirley Humphrey heard Johnny Lewis tell the Defendant to "make sure the little girl isn't there." At around 1:00 on the morning of the murders, Brandy Hodges heard the Defendant's truck enter the driveway of Ms. Watts' house. She said that she recognized the Defendant's truck because it had "an extremely loud engine exhaust" on it, and she "had become pretty used to hearing it." Finally, Agent Ogle testified that, when he asked the Defendant about tools, the Defendant mentioned the torque wrench and described exactly where investigators located it at the crime scene. However, several witnesses, including Ms. Watts' daughter, who had been in the house the day before the murders, testified that there was no torque wrench in the living room at that time. Although the Defendant offered two witnesses who testified that he was in Winchester

at the time of the murders, the jury obviously discredited the testimony of these witnesses and found the Defendant guilty. While not overwhelming, the proof is sufficient to support the convictions.[1]

In his second issue, the Defendant argues that the indictment was insufficient because it did not set forth the aggravating factors relied upon by the State to warrant a sentence of life without the possibility of parole. In support of his argument, he cites Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), in which the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. In Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court extended its holding in Apprendi to capital cases. The court specifically held that the jury, not the trial judge, was required to find the aggravating circumstances necessary to impose the death penalty. See id. at 609.

However, our supreme court has held that "the principles of Apprendi do not apply to Tennessee's capital sentencing procedure." State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002). "Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." Id. In accordance with our supreme court's holding in Dellinger, we hold that the principles of Apprendi do not apply to Tennessee's capital sentencing procedure.

Moreover, in the recent case State v. Daryl Keith Holton, No. M2000-00766-SC-DDT-DD, 2004 Tenn. LEXIS 1 (Tenn., Nashville, Jan. 5, 2004), our supreme court stated

> After the release of our opinion in Dellinger, the United States Supreme Court issued its opinion in Ring. The narrow question presented in Ring was "whether [an] aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." 536 U.S. at 597. The Court in Ring pointed out the limited nature of the issue, noting that of the thirty-eight states with capital punishment, twenty-nine, including Tennessee, "commit sentencing decisions to juries." Id. at 606 n.6. The Court also emphasized that Ring did not contend that his indictment was constitutionally defective and noted that the Fourteenth Amendment has not been construed to apply to the states the Fifth Amendment right to "presentment or indictment of a Grand Jury." Id. at 597 n.4 (quoting Apprendi, 530 U.S. at 477 n.3). The narrow holding of the Court in Ring is because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater

---

[1]The Defendant also argues that the evidence is insufficient to support his conviction of conspiracy to commit murder. However, the trial court, without objection from the State, merged that conviction into the conviction for the murder of Dianne Watts. Therefore it is unnecessary for us to address the sufficiency of the evidence with respect to the conspiracy conviction.

offense,"the Sixth Amendment requires that they be found by a jury. <u>Id.</u> at 609. Contrary to the defendant's assertions, <u>Ring</u> does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards. . . . . Therefore, <u>Ring</u> provides no relief to the defendant and does not invalidate this Court's holding in <u>Dellinger</u>.

<u>Daryl Keith Holton</u>, 2004 Tenn. LEXIS 1, at *43. Therefore, we conclude that the Defendant's argument that the indictment was defective on the basis that the aggravating factors were not charged therein is without merit.

The final issue raised by the Defendant is whether the trial court improperly charged the jury as to the State's burden of proof. Specifically, the trial court instructed the jury:

When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. <u>It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged.</u> Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense.

(Emphasis added). The Defendant argues that the underlined portion of the charge effectively relieved the jury of its responsibility to examine the proof as to each element of the charged offenses. We disagree. In <u>State v. Bane</u>, 853 S.W.2d 483, 487-88 (Tenn. 1993), our supreme court upheld an identical instruction as a correct statement of the law. The Defendant relies again upon <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). These two cases interpret the United States Constitution to require that each fact or element that is a condition to the imposition of a sentence above the statutory maximum must be decided by a jury beyond a reasonable doubt. These cases do not mandate that each and every discrete fact indicating guilt in a criminal prosecution be proven beyond a reasonable doubt. All that is necessary is that the elements of the charged offense be proven beyond a reasonable doubt. Therefore, the trial court's instruction in this regard was proper, and this issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE