IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2004

## STATE OF TENNESSEE v. WILLIAM KEITH MATTHEWS

**Direct Appeal from the Circuit Court for Houston County**
**No. 4510    Robert E. Burch, Judge**

-----

**No. M2003-01889-CCA-R3-CD - Filed February 4, 2005**

-----

This is a direct appeal as of right from a bench trial conviction of first degree premeditated murder. The Defendant, William Keith Matthews, was sentenced to life in prison. On appeal, the Defendant argues four issues: (1) there was insufficient evidence to find the Defendant guilty of first degree premeditated murder beyond a reasonable doubt, and in the alternative, the defense of insanity was established; (2) the trial court erred in not granting the Defendant's motion for judgment of acquittal; (3) the Defendant was not competent to stand trial; and (4) the Tennessee statute providing for the insanity defense is unconstitutional. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

William B. "Jake" Lockert, III, Public Defender, Ashland City, Tennessee, for the appellant, William Keith Matthews.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Dan Alsobrooks, District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

In the late evening hours of February 20, 2001, the Defendant stabbed to death and mutilated his grandmother, Ms. Bobbie Jean Judkins, in her home in rural Houston County. The Defendant, who lived in the same house with his mother and the victim, stripped nude, stabbed his sleeping grandmother over thirty times with kitchen knives, cut her open, and attempted to eat her liver. The Defendant, who has a history of mental illness, claimed he killed his grandmother at the request of a voice in his head and for "religious purposes." In September of 2001, a Houston County grand jury indicted the Defendant for first degree premeditated murder.

A court order was entered directing the Defendant to be evaluated to determine his competency to stand trial, and to assess the merits of a potential insanity defense.[1] The results of the evaluation were presented during an evidentiary hearing in September of 2002, at the conclusion of which the trial court found the Defendant not competent to stand trial. A court order was issued in October of 2002, committing the Defendant to a mental health facility with directions that the facility report back to the court every six months on the Defendant's progress as it pertained to his competency to stand trail.

In a letter dated January 15, 2003, the Middle Tennessee Mental Health Institute (MTMHI) notified the trial court that the Defendant's treatment was successful and his condition had improved to the point that his doctors believed he was competent to stand trial.[2] The Defendant was found competent to stand trial, waived his right to a jury, and was tried in a bench trial over the course of four days in March of 2003.

At trial, the State called Officer Darrell Allison of the Houston County Sheriff's Office, who testified that he was the first officer on the scene. When he arrived at the victim's house the night of the killing, he met the Defendant's distraught mother at the front door. She informed Officer Allison that her mother had been murdered and that the Defendant was missing. As Officer Allison was securing the crime scene, he observed the Defendant walking toward the house. The Defendant identified himself and was arrested without incident. Officer Allison stated the Defendant had a cut on his hand that he apparently bandaged himself, was dressed neatly, and exhibited no unusual behavior. The Defendant was read his Miranda rights.

Dr. Charles Warren Harlan, who conducted the autopsy on the victim, testified that the victim died as a result of "loss of blood from the multiple stab wounds which she received to the chest and abdomen." Dr. Harlan's autopsy report identified thirty-three wounds, the largest ten inches by five inches on the victim's abdomen, where the Defendant had attempted to get the victim's liver. Dr. Harlan testified that the forensic evidence suggested the victim struggled during the stabbing, and likely died within fifteen minutes to an hour.

The last witness the State called in its case in chief, Special Agent Joe Craig of the Tennessee Bureau of Investigation (TBI), testified that he interviewed the Defendant the day he was arrested and only hours after the murder. Agent Craig described the Defendant's demeanor as "very calm, very non-emotional . . . very cooperative." The Defendant admitted that he killed his grandmother,

---

[1] The initial court order directed the Defendant to be evaluated by the Harriet Cohn Psychological Center. In April of 2001, Harriet Cohn informed the trial court that it was unable to make a competency determinationon on an outpatient basis, and recommended the Defendant be sent to the Forensic Services Division of Middle Tennessee Mental Health Institute (MTMHI) for a more extensive evaluation. In May of 2001, the trial court issued an order directing the Defendant to be evaluated by the MTMHI.

[2] The MTMHI also noted in the letter to the court that the Defendant no longer met the standards for commitment and they were discharging him to the Houston County Sheriff's Office, but that the Institute did support the Defendant's use of the insanity defense at trial.

and seemed to recognize that the killing was wrong. He stated that he planned the crime in the early afternoon, then late that night when his grandmother was asleep he went to the kitchen, chose a knife, and proceeded to stab his grandmother. The Defendant also informed Agent Craig that he believed he would likely go to jail for his actions and indicated he understood the nature of his actions. The Defendant said nothing about hearing voices. As to motive, the Defendant stated only that he committed the crime "out of respect" for his grandmother and for "religious purposes." He also stated that he believed "something good will come out of it."

At the conclusion of the State's case in chief, the defense moved for a judgment of acquittal. See Tenn. R. Crim. P. 29. In support of this motion, the defense claimed that the State failed to prove the premeditation element of first degree murder. In addition the defense argued that the State had actually proven that the Defendant was insane and therefore not guilty by reason of insanity. The trial court denied the motion, stating that the evidence, observed in the light most favorable to the State, did indicate premeditation and fell short of proving the Defendant was insane. The court noted the Defendant's retrieval of a knife from the kitchen as well as his confession of advance planning as evidence of premeditation. As to insanity, the trial court admitted "evidence of bizarre behavior" on the Defendant's part, but concluded that mental illness had not been demonstrated in the State's proof. Upon denial by the court, the defense chose not to stand on its motion for a judgment of acquittal, and proceeded to present its case.

The defense called the Defendant's mother, who testified about the Defendant's long history of mental illness. She stated that the Defendant had stopped taking his anti-psychotic medications two weeks prior to the murder, and often "huffed" gasoline. She further testified that she had discovered her mother's body that night, placed the call to 911 reporting the incident, and told the authorities that she believed her son may have committed the crime. She also stated that she had been informed that forensic evidence, including blood in the doorway and on the doorknob to her bedroom, indicated the Defendant also entered her room the night of the murder while she was sleeping, but did not attack her.

Detective David Hicks, an investigator with the district attorney's office, testified that he had interviewed the Defendant on several different occasions following his arrest. Mr. Hicks stated that when asked why he committed the crime, the Defendant replied that he did so because people should not get old, he believed he was doing his grandmother a favor, and that he actually showed her "respect" by killing her. The Defendant further informed Detective Hicks that he did not kill his mother as he had initially planned because killing his grandmother did not produce the spiritual effect he both anticipated and desired. Although not certified by the court as an expert in psychology, Detective Hicks offered his layman's opinion that the Defendant was "nutty as a fruitcake."

The defense called two witnesses in forensic psychology from MTMHI, Dr. Sam Craddock and Dr. Iokeye Farooque, both stipulated to be experts. Dr. Craddock testified that he examined and observed the Defendant for approximately three months, from the time the Defendant was declared

incompetent to stand trial and committed to his facility until the time of his discharge.[3]    Dr. Craddock concluded that while the Defendant responded well to anti-psychotic medication, he was at the time of the murder delusional. Dr. Craddock testified that the Defendant explained to him that he believed he would receive a "spiritual experience" from killing his grandmother; he loved her but killed her for "religious reasons"; and that he heard the voice of his twin sister, who told him to kill his grandmother so they could be together.[4]  Dr. Craddock also testified that he believed the Defendant was not malingering, or faking mental illness for his own benefit. Dr. Craddock concluded that at the time of the murder the Defendant suffered from both delusions and hallucinations, and it was his opinion that the Defendant "failed to appreciate the nature of his conduct," and "failed to appreciate the wrongfulness [of his conduct]."

Dr. Farooque testified that the Defendant had been admitted to MTMHI on four separate occasions, and she evaluated him on one such occasion in July of 2001. Dr. Farooque diagnosed the Defendant as suffering from schizophrenia. She admitted that the Defendant was assigned many different diagnoses over the years and was also a substance abuser with a preference for inhalants. She noted that while in jail and in mental institutions he did not have access to illegal substances but continued to be delusional. When questioned about the Defendant's state of mind during the commission of the crime, Dr. Farooque testified that she was of the opinion that "he was at that time so psychotic and he had the loss of touch with reality that he -- he was not able to appreciate the wrongfulness of his -- that particular act and the nature of that."

The State called as a rebuttal witness Dr. Kimberly Stalford, a consulting liaison psychiatrist, whom the court recognized as an expert in psychiatry after a voir dire examination. Dr. Stalford testified that after several meetings with the Defendant and careful review of all his records, she disagreed with Dr. Craddock's and Dr. Farooque's diagnoses. Dr. Stalford concluded that the Defendant's primary problems were polysubstance abuse and anti-social personality disorder. She referenced the Defendant's long history of inhalant dependence as well as LSD, marijuana and cocaine abuse to support her diagnosis. She also pointed out the Defendant's frequent problems with the law, penchant for dishonesty and theft, and impulsive behavior as evidence of his anti-social personality disorder. In her view, the Defendant's drug use led to symptoms that resembled psychosis, but that he was not schizophrenic. Dr. Stalford noted that when the Defendant was hospitalized and had no access to illegal drugs he improved, but his hallucinations returned during the times he was released and admitted to abusing inhalants. Dr. Stalford further testified that she believed Dr. Craddock's tests were unreliable because the Defendant refused to cooperate with the process, and simply disagreed with Dr. Farooque's diagnosis of schizophrenia. Dr. Stalford testified that the Defendant's recitation of his social, occupational and drug histories was remarkably organized and in her opinion did not indicate schizophrenia. Furthermore, she concluded that the

_____

[3]In the trial transcript, Dr. Craddock states the three months began when the Defendant was "determined to be competent to stand trial" and admitted to his facility on October 21, 2002. However, this is an obvious misstatement as the record clearly indicates that the Defendant was declared not competent to stand trial and committed to the MTMHI by court order in October of 2002. The Defendant was subsequently released in January of 2003.

[4]The Defendant never had a twin sister.

Defendant's recorded interview with the authorities shortly after the murder showed no evidence of psychotic behavior, and noted that a person is not psychotic one moment and then perfectly sane the next.

When asked if the Defendant appreciated the nature of his act, Dr. Stalford answered in the affirmative, noting that the Defendant had been "consistent about the fact that he was stabbing his grandmother," and when asked why he kept stabbing her, his answer was that "she just didn't die," which indicated that "he understood he was ending her life." Dr. Stalford further stated that she believed "he appreciated the wrongfulness of his act," specifically noting that: he ran away because he knew the police were coming; he admitted that at the time of the crime he believed killing someone was wrong; and he didn't tell anyone that a full week prior to the crime he heard voices telling him to kill his grandmother because he knew he would get in trouble. Dr. Stalford concluded that while the reason the Defendant gave for killing his grandmother was certainly delusional, the act itself was not.

Against the advice of his counsel, the Defendant insisted upon testifying at the trial despite his earlier indication that he would not.[5] The trial court conducted an examination of the Defendant and determined that the Defendant had changed his mind and made an informed decision to testify on his own behalf.[6] When asked if he knew why he was in court, the Defendant answered affirmatively and stated, "I killed my grandmother." The Defendant also testified that he planned the murder earlier in the day in his bedroom with his twin sister and waited until midnight because that was when "me and my sister planned to kill my grandmother." The Defendant testified that at the time of the murder he believed he had a twin sister, she was speaking to him, and that if he killed his grandmother he could have a "relationship" and "eternal life with her," but he no longer held such beliefs.

When asked to describe his plan to the court, the Defendant stated: "My sister told me that day, after I agreed to do it, she wanted to have some type of a -- a bloodbath or orgy or something like that with either my mother or my grandmother, whichever one. You know? And that's what we decided to do." The Defendant described the events of the murder as follows: he left his bedroom and selected a knife from the kitchen; his grandmother was sleeping when he went into her bedroom and started stabbing her; she struggled and pleaded with him to stop; when she tried to reach for the phone he cut the cord; the first knife he used broke and he cut his own hand; he went to the kitchen and obtained another knife and continued stabbing the victim; the stabbing took a total of seven to ten minutes; after the victim was dead he cut her open because "that's what we [he and his twin sister] planned to do" and because "we were going to eat an organ." After killing his grandmother, he testified that he went to his mother's bedroom and considered killing her as well,

---

[5]The Defendant had earlier signed a waiver of his right to testify.

[6]See Momon v. State, 18 S.W.3d 152 (Tenn. 1999) (holding that the right of a criminal defendant to testify on his or her own behalf is a fundamental, constitutional right guaranteed by both the federal and state constitutions, and such right can only be waived personally by the defendant).

but ultimately decided not to.[7] The Defendant stated that after the murder he took a shower, dressed, and ran into the woods to hide from police because he knew they would come. He stated that he returned and surrendered upon observing all the police vehicles that responded to the crime scene that night, and after realizing he did not want to spend his life on the run.

The Defendant also testified that he was not the "type" of person who killed people, and explained the murder of his grandmother by stating, "I just made a mistake." He further stated that "it just happened one day . . . I lost my mind and didn't know what I was doing." On cross-examination, the Defendant was asked if he would have killed his grandmother if someone had been there watching. He responded that he would not have.[8]

At the conclusion of the trial, the judge issued his ruling from the bench, stating: "this court finds, beyond a reasonable doubt, that the defendant intentionally killed the deceased. . . [and] this killing was premeditated." The court noted as evidence of premeditation the fact that the Defendant "decided to kill the deceased while he was in his bedroom, went into the kitchen, armed himself with a kitchen knife, went into the deceased's bedroom and stabbed her while she was sleeping."

Observing that the primary issue before the court was the insanity defense, the court further found that the Defendant had proven by clear and convincing evidence that he suffered from a "severe mental disease or defect at the time of the crime." Additionally, the court found

> by a preponderance of the evidence that as a result of such disease or defect the defendant was unable to appreciate the wrong -- nature and wrongfulness of his actions; but finds that it has not been established by clear and convincing evidence that as a result of such disease or defect the defendant was unable to appreciate the nature or wrongfulness of his actions.

Therefore, the court concluded that the Defendant had failed to establish a defense of insanity, found him guilty of murder in the first degree, and sentenced him to life in prison. The Defendant filed a motion for a new trial in March of 2003, and the trial court denied the motion after an evidentiary hearing in July of 2003. The Defendant timely filed a notice of appeal with this Court.

---

[7]On the stand at trial, the Defendant was unable to give a reason for not also killing his mother as planned. However, in an interview with Mr. Hicks the Defendant stated he did not kill his mother because he "didn't think it would do any good" considering he failed to get the spiritual response he hoped for after killing his grandmother. Also, Dr. Stalford testified that the Defendant informed her that he did not kill his mother because she was younger and it would have been harder to kill her, and he was not sure how she would turn out since she still had many years ahead.

[8]The prosecution asked this same question of the two defense expert witnesses. Dr. Craddock testified that the Defendant would likely have "waited" for another time when there were no witnesses, while Dr. Farooque refused to answer the question.

**ANALYSIS**

On appeal, the Defendant outlined six specific arguments in his appellate brief: (1) the evidence was insufficient to support a conviction for first degree murder; (2) the Defendant was insane and therefore incapable of premeditated murder; (3) the Defendant was not competent to stand trial or testify on his own behalf; (4) the statutory and case law definitions of Tennessee's insanity defense are unconstitutionally vague; (5) the burden of proof required by the Tennessee insanity statute is unconstitutionally unfair; and (6) the trial court erred in not granting the Defendant's motion for judgment of acquittal at the end of the State's proof. We find the Defendant's arguments unpersuasive on each claim.[9]

**I. Insufficient Evidence**

In his first two claims, the Defendant challenges the sufficiency of the evidence to support the trial court's conclusion that, first, he was guilty of premeditated murder, and second, that he failed to establish the defense of insanity by clear and convincing evidence. The Defendant intermingles the two issues in his brief under the singular theory that the Defendant was insane and therefore incapable of premeditation, an element of the crime for which he was convicted. However, because the standard of appellate review for insufficient evidence is significantly different from our review of the affirmative defense of insanity, we will address the two issues separately.

**A. Sufficiency of Evidence Review**

On appeal from a bench trial, the findings of the trial judge carry the same weight as a jury verdict. See State v. Wilson, 990 S.W.2d 726, 729 (Tenn. Crim. App. 1998). Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by

---

[9]For the purposes of clarity and efficiency, we have combined the Defendant's six issues into the four addressed below.

the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree murder as charged in this case is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In the case at hand, it is undisputed that the Defendant killed the victim by intentionally stabbing her to death. The Defendant now argues that the State's evidence was insufficient to support the premeditation element of first degree murder. We disagree.

In Tennessee, "premeditation," for the purpose of premeditated first degree murder, is "an act done after the exercise of reflection and judgment," in which "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). Whether a defendant has acted with premeditation is a question of fact for the finder of fact to determine, and may be inferred from the manner and circumstances of the killing. See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). The evidence reveals that the Defendant planned the murder in his bedroom several hours before executing his plan. The Defendant carefully selected the time of the murder to correspond with when the victim was most likely to be asleep. The Defendant went first to the kitchen, selected a knife, and then proceeded to the victim's bedroom to carry out his plan. Based on this evidence, viewed in a light most favorable to the State, a rational finder of fact could find beyond a reasonable doubt that the Defendant killed the victim intentionally and with premeditation. This issue is without merit.

### B. Insanity Defense Review

The Defendant also argues that he was incapable of committing a premeditated killing because he was insane at the time of the murder. The Defendant asserts that there was no motive for him to murder his grandmother, who was his primary care-giver during his formative years and whom he "loved." The Defendant also claims he was sincere in his belief that by killing his grandmother he was showing respect for her, and he would obtain some sort of spiritual benefit and an eternal relationship with his imaginary twin sister. The Defendant now argues that his lack of a logical motive as well as the sincerity of his bizarre beliefs prove he was insane. Additionally, the Defendant attempts to accredit the testimony of the two experts who concluded at his trial that he failed to appreciate the nature or wrongfulness of his acts while discrediting the State's expert who held a contrary opinion. In summary, the Defendant claims that he presented sufficient evidence at trial to prove the affirmative defense of insanity, and therefore the trial court erred in its ruling. We disagree.

Tennessee Code Annotated section 39-11-501 provides for the insanity defense in Tennessee as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such

defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501(a) - (c).  The standard for sustaining an insanity defense is thus two-part: a defendant must demonstrate first, a "severe mental disease or defect," and second, prove that as a result he was unable to "appreciate the nature or wrongfulness" of the criminal act.  It is worthy of note that under this statute the "definition of insanity has been narrowed so that the defense now applies only when the defendant has a <u>severe</u> mental disease or defect," and that insanity is an affirmative defense where the State no longer must prove sanity, but rather "the defendant bears the burden" of proving insanity "by clear and convincing evidence." State v. Flake, 88 S.W.3d 540, 550-51 (Tenn. 2002) (Flake I) (emphasis in original).[10] "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" Id. at 551 (citing State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)). Although a higher standard than "preponderance of the evidence," this standard is less than "beyond a reasonable doubt." O'Daniel v. Messier, 905 S.W.2d 182, 188 (Tenn. Crim. App. 1995).

Our Supreme Court has declared that "appellate courts in Tennessee should apply the reasonableness standard" when reviewing a rejection of the insanity defense, further stating:

appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence.

Flake I, 88 S.W.3d at 554.   The Court went on to note that "[a] reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the [fact finder] appropriately rejected the insanity defense." Id. Such evidence properly includes "the facts surrounding the crime, testimony of lay witnesses, and expert testimony." Id. at 556.   Furthermore, the Court declared:

_____

[10]The insanity defense statute was amended in 1995, which resulted in several significant changes.  See Flake I, 88 S.W.3d at 550-551 (outlining the principle changes in the insanity defense after the 1995 amendment).

[t]he weight and value to be given expert testimony is a question for the jury. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Questions concerning the credibility of witnesses, the weight and value of evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations.

Id. at 554 (internal citations omitted).

In the case at hand, the trial court found that the Defendant proved by clear and convincing evidence that he suffered from a serious mental disease or defect, but concluded that he had not proven by clear and convincing evidence that as a result he was unable to appreciate the nature or wrongfulness of his act.[11]  In support of its ruling, the court listed four factors it found particularly significant in reaching its conclusion: (1) the Defendant resisted the alleged voices on prior occasions; (2) the Defendant cut the telephone cord during the stabbing to prevent notification of the authorities; (3) the Defendant fled the scene; and (4) immediately after committing the crime the Defendant "considered and rejected the impulse or direction to kill his mother." The court noted that all these factors indicated that the Defendant was able to appreciate the nature and wrongfulness of his actions at the time of the crime. The judge also stated he was "impressed" by Dr. Stalford's analysis of the Defendant.

Additionally, the evidence in the record reveals that the Defendant thoughtfully planned the murder, knew he was ending a life as evidenced by his admission that he kept stabbing his victim because "she would not die," and admitted that he would not have killed his grandmother if someone had been there to observe his actions. While there was conflicting testimony from the three expert witnesses concerning the Defendant's ability to appreciate the nature and wrongfulness of his actions at the time of the crime, such conflict is resolved by the trier of fact. Indeed, our Supreme Court has stated that "[w]here the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." Flake I, 88 S.W.3d at 556. This principle applies with equal force to findings at a bench trial.

Reviewing the evidence in this case under the principles outlined above, we conclude that the Defendant has failed to establish that no reasonable trier of fact could have found that he failed to prove by clear and convincing evidence that he was insane at the time of the offense.   The

---

[11]The trial judge noted that the Defendant did prove he was unable to appreciate the nature or wrongfulness of his actions by a "preponderance of the evidence," but not by the higher burden of "clear and convincing" as mandated by the statute.

evidence is sufficient to justify the Defendant's conviction of first degree murder. This issue has no merit.

## II. Judgment of Acquittal

The Defendant also argues that the trial court erred in not granting his motion for a judgment of acquittal entered at the end of the State's proof at trial. <u>See</u> Tenn. R. Crim. P. 29. However, it is well established that a defendant waives appellate review of the issue of whether a trial judge committed error in denying a motion for judgment of acquittal at the conclusion of the State's proof, where the defendant elects not to stand on his motion, but rather proceeds to introduce evidence in support of his case. <u>See</u> <u>Mathis v. State</u>, 590 S.W.2d 449, 453 (Tenn. 1979); <u>State v. Peat</u>, 790 S.W.2d 547, 548-49 (Tenn Crim. App. 1990). The record on appeal reflects that immediately after the trial court denied his motion for a judgment of acquittal, the Defendant called his first witness, and continued to present evidence over the course of the next three days. Therefore, we find the Defendant has waived this issue.

While this issue was procedurally waived, we briefly note that the Defendant's claim also fails on the merits. "The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed." <u>State v. Robinson</u>, 146 S.W.3d 469, 524 (Tenn. 2004). Thus, were we to examine the merits of whether the trial court erred in denying the Defendant's motion for acquittal, we would find no error for the same reasons addressed in our previous review of the Defendant's sufficiency of evidence challenge. Thus, this issue is also without merit.

## III. Competency to Stand Trial

The Defendant claims that the trial court erred in finding him competent to take the stand to testify on his own behalf, and also in finding him competent to stand trial. We disagree.

The right of a criminal defendant to testify on his or her behalf is a fundamental right guaranteed by both the Federal and Tennessee Constitutions. <u>See</u> U.S. Const. amend. V, XIV; Tenn. Const. art. I, § 9; <u>see also</u> <u>Momon v. State</u>, 18 S.W.3d 152, 161 (Tenn. 1999). The trial court recognized that the Defendant "expressed his desire to testify" after having carefully been reminded of the advantages and disadvantages of doing so by his own counsel. We find the trial court did not err in recognizing and granting the Defendant's constitutional right to testify on his own behalf.

However, the Defendant also claims he was not competent to stand trial, and therefore should never have been placed in a position of having to decide whether to testify on his own behalf. The test for determining whether a defendant is competent to stand trial is whether the defendant has the "capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." <u>State v. Black</u>, 815 S.W.2d 166, 174 (Tenn. 1991). Furthermore, "[t]he burden is on the defendant to establish his incompetency by a preponderance of

the evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). On appellate review, "the trial court's findings are conclusive unless the evidence preponderates otherwise." State v. Leming, 3 S.W.3d 7, 14 (Tenn. Crim. App. 1998).

The Defendant was initially declared incompetent to stand trial and subsequently committed to the care of a mental institution following his arrest. However, approximately three months after his commitment, the Defendant was released from the hospital. In January of 2003, the trial court was advised by the MTMHI that the Defendant had "improved sufficiently" due to successful treatment, and that the "team clinicians" were of the opinion that the Defendant was "competent to stand trial." This determination was made based on their opinion that the Defendant "understands the charge(s) pending against him and the consequences which might follow and that he is able to advise counsel and participate in his own defense."[12] In addition to the MTMHI evaluation, the trial judge also considered his own observations of the Defendant, and based on all the evidence, concluded that the Defendant was indeed competent to stand trial.

At the hearing on the Defendant's motion for a new trial, the trial judge stated: "I observed [the defendant] during the trial. As much as I could determine, he was competent to stand trial, then, and I think he's competent now." On appeal, the Defendant has not pointed to evidence that would suggest he was incompetent at the time of his trial. We note that while the MTMHI provided two experts who testified that the Defendant was insane at the time of the crime, this same facility also concluded the Defendant was competent to stand trial. Thus, there was no difference of opinion among the expert witnesses concerning the Defendant's competency to stand trial. The Defendant has failed to demonstrate that the evidence preponderates against the conclusion of the trial court. Accordingly, this issue is without merit.

## IV. Constitutional Challenge to Tennessee Insanity Defense

The Defendant's final two issues presented on appeal are that the Tennessee statute providing for the insanity defense is unconstitutional, first because the "statutory and case law definitions" are so vague as to be unconstitutional, and second, because the burden of proof is unconstitutional. However, because the Defendant failed to include any legal authority or argument in support of his claims, he has waived these issues.

Our Court requires that a defendant on appeal present an argument, make appropriate references to the record, and cite relevant legal authority in support of his or her argument. See

---

[12] In this same letter to the court, the MTMHI also stated that they "did support an insanity defense," despite the fact that they declared the Defendant no longer met the requirements of comittment, and was competent to stand trial.

Tenn. Ct. Crim. App. R. 10(b).[13] Additionally, all Tennessee appellate courts require the appellant's brief to contain an argument, citations to authorities, and appropriate references to the record.  See Tenn. R. App. P. 27(a)(7).[14]   Failure to comply with these basic rules will ordinarily constitute a waiver of the issue.  See Tenn. Ct. Crim. App. R. 10(b); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

In the present case, the Defendant's "argument" as to both claims consists of a one-sentence conclusory statement that the Tennessee insanity defense statute allows "a situation where a Defendant, who is more likely than not, not guilty by reason of insanity is convicted of first degree murder."  The Defendant makes no reference at all to what terms he believes to be unconstitutionally vague.  The Defendant cites no legal authority in support of either of these claims.  We note that this Court has held the insanity defense statute's burden of proof of "clear and convincing evidence" to be constitutional.  See State v. Perry, 13 S.W.3d 724, 741 (Tenn. Crim. App. 1999); see also State v. Holton, 126 S.W.3d 845, 861 (Tenn. 2004) (holding that placing the burden of proof on the defendant to prove insanity is not unconstitutional).  In any event, we do not address these issues because they are waived.

## CONCLUSION

For the foregoing reasons we affirm the judgment of the trial court.

---

DAVID H. WELLES, JUDGE.

---

[13]"Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."  Tenn Ct. Crim. App. R. 10(b).

[14]"The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on."  Tenn. R. App. P. 27(a), (a)(7).